**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

VIRGINIA D. PEEPER,

       Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

       Defendant-Appellee.

No. 10-5070
(D.C. No. 4:08-CV-00658-TLW)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **ANDERSON**, and **TACHA**, Circuit Judges.

---

Virginia D. Peeper appeals[1] from an order of the district court affirming the

Commissioner's decision denying her application for Social Security disability

and Supplemental Security Income benefits.  She filed for these benefits on

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]     Our jurisdiction derives from 28 U.S.C. § 1291 and 42 U.S.C. § 405(g).

June 8, 2006, alleging disability beginning on January 1, 2003. The agency denied her applications initially and on reconsideration.

On June 10, 2008, Peeper received a de novo hearing before an administrative law judge (ALJ), who followed a five-step sequential evaluation process to determine whether she was disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988). The ALJ found: at step one, Peeper was not presently engaged in substantial gainful activity, Aplt. App., Vol. 1 at 58; at step two, she had a combination of impairments that were severe, *id*.; at step three, none of the impairments or combination of impairments met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Aplt. App., Vol. 1 at 58-59; at step four, her RFC did not allow her to perform the requirements of her past relevant work, *id*. at 61; and, at step five, she was not disabled because other work existed in significant numbers in the national economy she was capable of performing, *id*. at 62. In making these findings, the ALJ determined Peeper retained the RFC to perform light work "except no overhead reaching or lifting of objects over 10 pounds." *Id*. at 60. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

In this appeal, Peeper raises two issues. First, the ALJ failed to properly consider her fibromyalgia in that there is a "complete lack of discussion of the treatment notes by the ALJ." Aplt. Br. at 12. She asserts "the ALJ simply relied on one source for his assessment of Peeper's fibromyalgia, Dr. Malati." *Id*. at 13.

Second, she argues the ALJ's negative credibility determination was not adequately supported by the record.

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cowan v. Astrue*, 552 F.3d 1182, 1184-85 (10th Cir. 2008) (quotation omitted). Because cannot confirm the basis for the ALJ's negative credibility finding, we must reverse and remand for further proceedings.

I.

As we are remanding based on Peeper's second issue, we need not spend much time evaluating the adequacy of the ALJ's discussion of her claimed fibromyalgia. She argues that the ALJ failed to properly consider her fibromyalgia; specifically, she claims there is a "complete lack of discussion of the treatment notes by the ALJ." Aplt. Br. at 12. But her argument minimizes, if not ignores, a most salient fact—nowhere in the record do we see a formal diagnosis of fibromyalgia. When she applied for disability benefits in June 2006, she alleged "[m]obility problems with [her] right shoulder/arm" limited her ability to work. Aplt. App., Vol. 1 at 144. Specifically, she claimed she couldn't "RAISE, LIFT, AND MOVE THE RIGHT ARM WITHOUT SEVERE PAIN. AT [T]IMES I HAVE TO PUT IT IN A SLING IF I'M WALKING." *Id*. Her medical

records, the earliest of which date from 2002, show her most consistent complaints have indeed been pain, weakness, muscle spasms, and knots in her neck and upper extremities, particularly her right arm and shoulder. Her earliest records show she was treated for osteoarthritis but, starting in the middle of 2005, osteoarthritis is no longer discussed and the treatment notes begin to refer simply to chronic pain. In 2005 and 2006, x-rays, a computed tomography (CT) scan, and a magnetic resonance imaging (MRI) scan of her neck were completed. None showed any medical reason for her complained-of pain and weakness.

After filing for disability in June 2006, Peeper underwent a consultative examination by Dr. Adel Malati on August 24, 2006. The report from that examination shows that her chief complaint was aches and pains in her shoulders and arms to the point where she could not raise her right arm without pain in the middle of her arm. Dr. Malati reported Peeper told him "she did not have any confirmed diagnosis, but stated that some physician told her that she *might* have fibromyalgia." Aplt. App., Vol. 1 at 207 (emphasis added). Dr. Malati's range of joint motion evaluation revealed she had a full range of motion. *Id*. at 211-12. He completed an examination of her lumbosacral spine and cervical spine; it was negative as well, showing that she had no pain, tenderness, or muscle spasms. *Id*. at 213. Dr. Malati's clinical impression was: "Unexplained pain in shoulders. Osteoarthritis/presumable fibromyalgia." *Id*. at 210. He noted:

The patient was seen walking in and out of the office without any difficulty.  The patient did not use any assistive device.  The patient has a nice, normal, steady gait.  The patient was able to sit, stand, and lie down without difficulty.  The patient has a full range of motion in her neck, shoulders, elbows, wrists, and hands.  The patient has a good hand grip of 5/5 and equal bilaterally.  Also the patient had full range of motion in her back, hips, knees, and ankles.  The patient was able to do heel walking, toe walking, and heel-to-toe walking without difficulty.  On examination of her shoulders the patient had some crackles in moving of her shoulders.

*Id.*

Based on Dr. Malati's consultative examination, a Physical RFC Assessment was completed by Dr. Luther Woodcock on September 5, 2006, finding Peeper could occasionally lift 50 pounds and frequently lift 25 pounds, could stand and/or walk six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and have unlimited pushing or pulling.  The assessment found no other limitations and noted no treating or examining source statements regarding Peeper's physical capacities in the file.

The day after being examined by Dr. Malati, Peeper visited the emergency room complaining that, because of his exam, she could not turn her head to the left when she awoke that morning and her left shoulder pain was worse.  *Id.* at 243.  A note from her stated that she told Dr. Malati she could not raise her arms above her head without pain and he stated "I will do it for you then so you won[']t cause yourself pain."  *Id.* at 244.  The record also contains a medical record, evidently from Peeper's primary care physician, from August 28, 2006,

wherein she continues to complain of injury during the consultative examination. She reported how Dr. Malati assisted her to raise her hands above her head as she was unable to do so by herself without pain. *Id*., Vol. 2 at 294. During the manipulation she felt a pop in her left shoulder area and had burning pain that worsened throughout the day. *Id*. The record stated: "Needs eval for possible fibromyalgia" and a referral had been made for a neurology evaluation. *Id*.

This was not the first time Peeper had been referred for a neurology evaluation. A medical record from March 1, 2006, shows she requested, and was given, a neurology referral after she received the negative results of the MRI. *Id*. at 304. But we can find no record of an evaluation by a neurologist in the administrative record. Nor, as noted above, can we find a formal fibromyalgia diagnosis by any other provider, although medical professionals treated Peeper as if she had fibromyalgia as time went by. The record does not show an examination of whether Peeper had tenderness at any of the eighteen fixed locations associated with fibromyalgia, *see Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("[T]he only symptom that discriminates between [fibromyalgia] and other diseases of a rheumatic character [are] multiple tender spots, more precisely 18 fixed locations on the body . . . that when pressed firmly cause the patient to flinch."). Nor does the record indicate how, or if, other possible causes for her pain were specifically ruled out. *See Preston v. Sec'y of Health & Human Servs*., 854 F.2d 815, 817-18 (6th Cir. 1988) (recognizing that a fibrositis

diagnosis—fibrositis is another term for fibromyalgia—is a "diagnosis by exclusion and testing of certain focal tenderpoints on the body for acute tenderness" (further quotation omitted)).

Nevertheless, Peeper says she has consistently "sought treatment concerning problems stemming from fibromyalgia," and the ALJ "failed to properly consider her fibromyalgia." Aplt. Br. at 11. But the complete absence of a fibromyalgia diagnosis in the record undercuts any assertion of error due to the ALJ's not specifically addressing "fibromyalgia," as opposed to "chronic pain."[2] The ALJ's failure to discuss the treatment notes mentioning fibromyalgia may have meant he did not consider "[t]he longitudinal picture of [her] fibromyalgia." Aplt. Br. at 12. But that failure is insignificant. Those notes provide ample evidence of her long-term claims of chronic pain, a fact credited by the ALJ, but they wholly fail to prove the presence of fibromyalgia and offer no proof as to the level of functional disability caused by the reported pain.

---

[2] Peeper also testified to being tired all the time and asserted that she had "that fatigue syndrome." Aplt. App., Vol. 1 at 76. This appears to be a reference to chronic fatigue syndrome, another diagnosis sharing a number of symptoms with fibromyalgia. *See Wilson v. Astrue*, 602 F.3d 1136, 1143 (10th Cir. 2010) (noting that "complaints of severe pain that do not readily lend themselves to analysis by objective medical tests are notoriously difficult to diagnose and treat, and the diagnoses themselves are often overlapping"). However, it is unclear whether her statement was self-diagnosis or yet another medical diagnosis not present in the record.

II.

Turning to Peeper's second issue, the ALJ found she was not disabled, despite her long-term medical treatment for complaints of pain (as discussed above). This ultimate finding was grounded in the ALJ's more specific finding that her subjective complaints of pain lacked credibility. Peeper asserts the later finding was "just a conclusion in the guise of findings" in that it was not "closely and affirmatively linked to substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotations omitted).

The ALJ specifically recognized Peeper's testimony that

[s]he stopped working[] because she could not stand any more. She has trouble moving her right arm and difficulty writing. The claimant reported that she is constantly in pain and tired all the time. She takes medication for depression and anxiety, which makes her dizzy. Her 10-year-old son does a lot of things for her.

*Id*., Vol. 1 at 60. And he concluded her medically determinable impairments, including chronic pain and degenerative disc disease, could be reasonably expected to produce the pain and fatigue of which she complained, and so proceeded to determine the credibility of her complaints of *disabling* pain and fatigue. *See id*. at 60-61.

The ALJ wrote:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they

-8-

are inconsistent with the residual functional capacity assessment[3]
for *the reasons explained below*.

*Id*. (emphasis added).

The "reasons explained below" were three:  (1) a temporal correlation between Peeper's separation from her husband and her application for social security benefits, (2) some statements by Peeper as to the limitations imposed by her conditions, which he thought undermined her disability claim, and (3) Dr. Malati's report which, as the only objective medical evidence of her residual functional capacity, found essentially no limitations.

A.

As to the first reason, the ALJ noted "[t]he claimant reported that she did not file for disability benefits until she and her husband separated."  Aplt. App., Vol. 1 at 61.  As it turns out, the statement is incorrect, although explicable.  At the hearing Peeper seemed to agree her filing for disability came right after she and her husband separated.  According to her testimony, her last job was at a laundry and, although she could not remember "how far back it was," she quit in 2000.  *Id*. at 69.  When the ALJ sought to confirm a 2000 termination date, she again said, "I'm not sure."  *Id*. at 70.  Later, when the ALJ asked when she had separated from her husband, she replied 2000.  He then asked if there was any connection between the couple's separation and her *quitting her job*.  She replied

---

3      As noted above, he found Peeper had the RFC to perform light work "except no overhead reaching or lifting of objects over 10 pounds."  *Id*. at 60.

there was not. *Id*. at 72. But, at the end of his questioning, the ALJ reconfirmed her separation from her husband was in 2000 and then said, "[j]ust about the time you filed this application, right?" *Id*. at 78. Peeper responded, "I think so." *Id*.

The record tells a different story. Peeper's work history report shows she worked at "EG's Laundry" from 2001 to 2002, not 2000. *Id*. at 168. And she testified to trying to work a part-time job at the Caroline Inn after she quit the laundry job but was unable to do so because of her pain and exhaustion.[4] Further, the record contains June 8, 2006, social security applications alleging a disability onset date of January 1, 2003. These facts undercut any supposed correlation between Peeper's separation and her benefit claim. It appears the ALJ simply misunderstood the record, and Peeper did nothing at the hearing to correct his misunderstanding.

### B.

The ALJ's second reason for finding Peeper's claims of disabling pain to lack credibility was:

> In terms of the claimant's alleged disabling pain and fatigue, she reported in a function report that she is able to do laundry, some food preparation, shopping, and dusting with her left hand (Exhibit 4E). The claimant testified at the hearing that she weeds her flower beds.

Aplt. App., Vol. 1 at 61. But a thorough review of the record, including the function report relied upon by the ALJ, gives us pause. The first concern is

---

[4] It appears she held that final job in January 2004 and only worked there for about a week. Aplt. App., Vol. 1 at 144.

Peeper's ability to do laundry. She did report such an ability, but also reported an inability to do the folding. Moreover, when her sister or mother came to her house they would do her laundry. *Id*. at 162, 164. The ALJ next asserts Peeper reported an ability to do "some food preparation, shopping, and dusting with her left hand." *Id*. at 61. But her report claims she could not cook big meals, but prepared "[h]amburger helper, frozen dinner, cereal, frozen waffles, frozen chicken strips, pizza, soup." *Id*. at 162. She acknowledged doing grocery shopping, but also reported a need to have a driver if she was traveling a long distance, and when driving shorter distances she had a small pillow on which she rested her right arm. Her report also said she could wipe counters and dust with her left hand.[5] Finally, the ALJ referred to Peeper's testimony about weeding her flower beds. When the ALJ asked Peeper what she did for recreation, she testified:

> I have, I love to go outside and work in flower beds, but I very rarely get to do that now. I'll go out there and try to pull the weeds out, you know, get some of it done, but my son that's ten years old, he helps me do a lot of stuff. He opens doors for me, doors that are hard for me to open. He will open doors for me, but recreation I like to just go outside and sit out in the yard and watch birds.

Aplt. App., Vol. 1 at 78. But her testimony must be considered along with her function report (also relied on by the ALJ). In it she wrote she *used* to grow

---

[5]     None of these minimal activities, standing alone, undercuts a claim of disability. *Hamlin v. Barnhart*, 365 F.3d 1208, 1221 (10th Cir. 2004) (holding that an ALJ may not "rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain." (quotation omitted)).

flowers, mow, and pull weeds, but now she "can't get into flowers—can't weed flower bed. Can't push or pull mower." *Id*. at 164. And in a second, later function report she simply stated "I cannot do outside work now." *Id*. at 191. The ALJ failed to adequately resolve the factual discrepancies.

Thus, the first piece of evidence upon which the ALJ relied in discrediting Peeper's claims of disabling pain (implied secondary gain suggested by the temporal relation between her marital difficulties and the filing for benefits) is undercut by the record, and the second (the level of functional disability caused by pain) is at least somewhat compromised.

On the other hand, Dr. Malati's report of the consultative examination is potent evidence—a hands on evaluation, including range of motion tests, and his observation of Peeper when she was unaware of being watched. After all, it appears that Dr. Malati's consultative examination was the only medical examination to give a significant opinion as to the limitations of Peeper's physical capabilities. While the numerous records of her treating providers all recorded Peeper's reported symptoms, discussed her various infirmities, and listed the medications prescribed for her, the only records (revealed by our record review) specifically discussing the extent of her physical limitations are records from January 3, 2007. They show Peeper was treated for a "Myofascial Strain C-Spine" and told to engage in "Activity As Tolerated," to be "Careful lifting, twisting, or bending," Aplt. App., Vol. 1 at 228, and "Careful lifting > 15 lbs," *id*.

-12-

at 223. Since Peeper's longstanding, but subjective, complaints of disabling pain are nowhere supported by objective medical evidence of record, Dr. Malati's report and observations might well be sufficient, standing alone, to factually support the ALJ's adverse credibility determination. But we cannot say it is necessarily so without substituting our judgment for that of the ALJ. *See, e.g., Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004) (holding that district court's "post hoc effort to salvage the ALJ's decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the administrative process").

First, Dr. Malati's report is somewhat ambiguous. The report of his examination shows no limitations, including—in his examination of Peeper's back—no pain, tenderness, or muscle spasms. Nevertheless, his clinical impression was "[u]nexplained pain in shoulders. Osteoarthritis/presumable fibromyalgia." *Id*. at 210. Although it is not entirely clear, it appears his clinical impression was not a formal diagnosis (osteoarthritis and fibromyalgia are separate conditions and Dr. Malati's examination found no pain or tenderness, much less tenderness at specified focal points required for a diagnosis of fibromyalgia) but merely an acknowledgment of Peeper's past complaints. Second, we cannot say that Dr. Malati's report, standing alone, would (as a matter of law) trump Peeper's subjective complaints had the ALJ found them to be

-13-

credible.  The agency' evaluation of pain is governed by 20 C.F.R.

§ 404.1529(c)(2), which reads:

> Consideration of objective medical evidence.  Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption.  Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.  We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  *However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.*

(emphasis added); *see also Huston v. Bowen*, 838 F.2d 1125, 1130-31 (10th Cir. 1988) (holding that, absent objective medical evidence of limitations due to pain, the ALJ still had to consider and make findings regarding the claimant's subjective pain evidence).

Since we cannot say Dr. Malati's report, standing alone, would be sufficient to trump Peeper's subjective pain complaints, any such finding would constitute <u>our</u> credibility determination, not that of the ALJ.  *See, e.g., Kepler*, 68 F.3d at 391 (holding that "[c]redibility determinations are peculiarly the province of the finder of fact" (quotation omitted)).  We are always hesitant to nitpick the ALJ's determination.  *See Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (in reviewing an ALJ's credibility determination, an appellate court "give[s] the

opinion a commonsensical reading rather than nitpicking at it").  But here, the ALJ gave three specific and somewhat summary reasons for his adverse credibility finding, with no indication as to the weight assigned to each.  Since we cannot know the relative weight assigned to those factors we must remand for clarification.

The judgment of the district court is REVERSED, and the case is REMANDED for further remand to the agency for additional proceedings in accordance with this order and judgment.

Entered for the Court

Terrence L. O'Brien
Circuit Judge